SIERRA NEVADA FOREST PROTEC-TION CAMPAIGN, Center for Biological Diversity, Natural Resources Defense Council, Sierra Club, and the Wilderness Society, non-profit organizations, Plaintiffs,

v.

Mark REY, in his official capacity as Under Secretary of Agriculture, Dale Bosworth, in his official capacity as Chief of the United States Forest Service, Jack Blackwell, in his official capacity as Regional Forester, Region 5, United States Forest Service, and James M. Peña, in his official capacity as Forest Supervisor, Plumas National Forest, Defendants.

and

Tuolumne County Alliance for Resources & Environment, et al.; California Ski Industry Ass'n; Quincy Library Group, et al.; and California Cattlemen's Ass'n, Defendants–Intervenors.

No. 2:05–cv–00205–MCE–GGH.

United States District Court, E.D. California.

Aug. 1, 2008.

Gregory Cahill Loarie, Michael Ramsey Sherwood, Earthjustice Legal Defense Fund Incorporated, Oakland, CA, Patrick Gallagher, Sierra Club Environmental Law Program, San Francisco, CA, David Brian Edelson, Law Office of David Edelson, Berkeley, CA, for Plaintiffs.

Barclay Thomas Samford, United States Dept. of Justice, Denver, CO, Brian C. Toth, Cynthia Sue Huber, U.S. Department of Justice, Washington, DC, David Taylor Shelledy, U.S. Attorney's Office, Sacramento, CA, Michael Bruce Jackson, Attorney at Law, Quincy, CA, for Defendants.

J. Michael Klise, PHV, Thomas R. Lundquist, PHV, Crowell & Moring LLP, Washington, DC, Steven P. Rice, Crowell & Moring LLP, Irvine, CA, Adam Strachan, Brian A. Kelly, Duane Morris LLP, San Francisco, CA, William James Thomas, Jr., Best Best and Krieger LLP, Sacramento, CA, for Defendants–Intervenors.

*MEMORANDUM AND ORDER*

MORRISON C. ENGLAND, Jr., District Judge.

The Plaintiffs in this case, a group of environmental organizations, challenge the 2004 Sierra Nevada Forest Plan Amendment ("SNFPA"), commonly known as the 2004 Framework, along with Basin, a site-specific forest management project promulgated following adoption of the 2004 Framework. Defendants are sued in their official capacities as representatives of the United States Forest Service ("Forest Service"). Plaintiffs contend that both the 2004 Framework and the Basin Plan, as promulgated by the Forest Service, run counter to the provisions of the National Forest Management Act ("NFMA") and the National Environmental Policy Act of 1969 ("NEPA"). Presently before the Court are cross-motions for summary judgment filed on behalf of both the Plaintiffs and Defendants.

### FACTUAL BACKGROUND

The Sierra Nevada contains some 11.5 million acres of National Forest Service land with eleven National Forests and encompasses "dozens of complex ecosystems each with numerous, inter-connected social, economic and ecological components." SNFPA 1920. In the late 1980s, the Forest Service began developing a comprehensive strategy for managing the myriad resources found within the region. In 1995, the Regional Forester for the Pacific Southwest Region of the Forest Service issued a draft Environmental Impact Statement ("EIS") outlining its management proposal. SNFPA 229.[1] After ex-

---

1. Documents found within the first eight-volume record are cited as SNFPA, followed by the Bates-stamp number.

tensive public participation and the preparation of a Final EIS responding to public concerns, the Regional Forester issued, in 2001, a Record of Decision ("ROD") which adopted management objectives in five major areas: old forest ecosystems; aquatic, riparian, and meadow ecosystems; fire and fuels; noxious weeds; and hardwood ecosystems on the lower westside of the Sierras. *Id.* at 231–35.

Among the thorniest issues confronted by the ROD was striking the appropriate balance between balancing the excessive fuel buildups occasioned by decades of fire repression and conserving key habitat for wildlife species dependent on old forest environments. The 2001 ROD included a network of "old forest emphasis areas" across about 40 percent of all national forest land in the Sierra Nevada that was designed to provide a contiguous network of old forest ecosystems conducive to species preferring such habitat like the California Spotted Owl, the American Marten and the Pacific Fisher. SNFPA 236. Aside from other areas slated for specific treatment (like a limited "urban wildland intermix" designed to create a buffer between developed areas and the forest), the 2001 Framework specified a "general forest" land allocation intended to increase the density of large old trees and the continuity and distribution of old forests across the landscape. SNFPA 236–37.

In order to protect old forest conditions within its specific areas of emphasis, the 2001 Framework generally prohibited logging that would remove trees over 12 inches in diameter or logging that would reduce canopy cover by more than 10 per-

cent. SNFPA 328. Even within the "general forest" areas, the 2001 Framework prohibited logging of trees over 20 inches in diameter. SNFPA 336. It was only within the intermix zones that no canopy restrictions were imposed and logging of trees up to 30 inches was permitted. SNFPA 333, 315.

Although the Forest Service ultimately affirmed adoption of the 2001 ROD despite receipt of approximately 200 administrative appeals, it nonetheless directed the Regional Forester to conduct an additional review with respect to specific concerns like wildfire risk and the Forest Service's responsibilities under the Herger–Feinstein Quincy Library Group Forest Recovery Act ("HFQLG Act"), a congressional mandate which established a Pilot Program for fire suppression through a combination of fire breaks, group selection logging and individual logging. SNFPA 1918. A management review team was assembled by the Regional Forester for this purpose.

In March 2003, the team concluded that the 2001 ROD's "cautious approach" to active fuels management had limited its effectiveness in many treatment areas. The management review team further found that revisions to vegetation management rules would decrease flammable fuels while protecting critical wildlife habitat by guarding against the risk of stand-replacing wildfire. See SNFPA 1918, 1926. Moreover, with respect to the California Spotted Owl ("CASPO" or "owl"), the team felt that the 2001 ROD had unnecessarily "took a worst case approach to estimating effects" on the owl. SNFPA 1968.[2] In

---

**2.** The 2001 Framework's CASPO analysis was largely predicated on a July 1992 report (the "CASPO Report") that recommended establishment of a 300–acre Protected Activity Center ("PAC") around all known owl nest sites, a complete prohibition of logging within the

PACs, more limited logging prohibition of trees over 30 inches in diameter in all habitat suitable for owl nesting and foraging, and a prohibition on logging that would reduce canopy cover below 40 percent in owl nesting habitat. SNFPA 1037–40.

addition to citing recent research indicating that habitat losses resulting from fuel treatments were less than previously believed, the team further found that the 2001 ROD's extensive reliance on maintaining extensive canopy cover was impracticable to implement.

Following receipt of the team's findings, the Regional Forester ordered that management strategy alternatives in addition to those considered in the 2001 FEIS be considered. A draft supplemental environmental impact statement ("DSEIS") was thereafter released to the public in January 2004. While the same five areas of concern were targeted in the DSEIS as in its 2001 predecessor, in 2004 a new action alternative was identified (Alternative S2), in addition to the alternative selected by the 2001 Framework (Alternative S1) and the seven alternatives that had previously been considered before adoption of the 2001 Framework (Alternatives F2–F8).[3] Following the public comment period after dissemination of the DSEIS, the SEIS in final form also included response to various issues raised, including comments by the United States Fish and Wildlife Service, by the United States Environmental Protection Agency, by California resources protection agencies, and by the Science Consistency Review ("SCR") team.[4]

By adopting the SEIS on January 21, 2004, the Regional Forester replaced the 2001 ROD with its 2004 successor and amended the forest plans for all eleven national forests situated in the Sierra Nevada. SNFPA 2987–3061. The 2004 ROD reasoned that the 2001 Framework "pre-scribed technical solutions that do not produce needed results, or offered methods we often dare not attempt in the current Sierra Nevada." SNFPA 2995. The 2004 Framework reasoned that the methods as adopted in 2001 fail to reverse the damage, and growing threat, of catastrophic fires quickly enough. *Id.*

The Chief of the Forestry Service ultimately affirmed the 2004 ROD,[5] with the direction that details of the ROD's adaptive management be submitted to him within six months. SNFPA 3997–4305. The Regional Forester submitted that supplemental information to the Chief on March 31, 2005.

Through the present lawsuit, Plaintiffs allege that the 2004 Framework as ultimately adopted runs afoul of both the NFMA and NEPA on a programmatic basis. Specifically, Plaintiffs contend that the 2004 Framework violates the NFMA both because it fails to maintain viable populations of CASPOs as well as Pacific Fishers and American Martens, small forest carnivores that, like the owls, prefer old-growth forest habitats. Moreover, Plaintiffs also argue that the 2004 Framework runs afoul of NEPA because it was adopted without either adequate disclosure of its significant environmental impacts or consideration of reasonable alternatives to the selected approach.

In addition to their general challenge to the 2004 Framework, Plaintiffs also target a site-specific plan adopted following the 2004 ROD, the Basin Group Selection Project ("Basin Project"). That Basin Project

---

3. The DSEIS also considered seven additional alternatives in addition to those considered in detail but eliminated the seven from extensive consideration because they were found to be inconsistent with the purpose and need of the DSEIS. SNFPA 3163–65.

4. The SCR consisted of eleven scientists convened by the Pacific Southwest Research Sta-tion in Davis, California, and included experts in fire and fuels management, forest ecology, and species viability. SNFPA 3503.

5. In so affirming, Forest Service Chief Dale Bosworth denied 6,241 separate administrative appeals of the 2004 Framework. SNFPA 3998.

area is located within the Plumas National Forest ("PNF") and encompasses some 38,893 acres south and west of Bucks Lake and north of the Middle Fork of the Feather River. BASIN 3665.[6] The Project incorporates vegetation treatments designed to fulfill the management direction of the PNF's Land and Resource Management Plan ("LRMP"), as amended by the HFQLG Act. BASIN 3666. The Basin Project envisions groups selection logging on 1,215 acres (in 800 one-to-two acre plots) and individual tree selection on another 80 acres, in which high-risk or crowded trees may be individually harvested while meeting established canopy-cover standards. BASIN 3643 Road changes within the Basin Project are also envisioned, as are improvements at road-stream crossings so as to reestablish fish passage and restore watershed connectivity. BASIN 3672–73. Implementation of the Project is anticipated over a five-year period. BASIN 3136.

A scoping letter for the Basin Project was sent to interested parties on December 19, 2003. BASIN 3044, 3673. Thereafter, on March 3, 2004, the Forest Service initiated a formal 30–day notice and comment period by publishing a notice in a Quincy, California, newspaper. BASIN 3155. Also on March 3, 2004, a detailed description of the proposed project was sent to interested parties who had already requested notification with respect to proposed activities. Once comment letters were received, response to comments was prepared, and a public open house to facilitate discussion of the Project was held, the Forest Service prepared an Environmental Assessment ("EA") for the Basin Project. BASIN 3657–3749. The EA considered two alternatives in detail: the no action alternative and its proposed action alterna-

tive. BASIN 3677. Seven other options were considered but eliminated from detailed consideration. The EA identified environmental resources subject to impact and considered the effects on each resource by the two alternatives scrutinized in detail. BASIN 3683–3722.

Following consideration of the EA, the Forest Supervisor issued a Finding of No Significant Impact ("FONSI") on August 25, 2004 and adopting the Basin Project pursuant to the EA. BASIN 3638–3656.

On October 12, 2004, one of the Plaintiffs herein, SNFPA, appealed the Basin Project decision. BASIN 2713. After the Forest Service's decision was affirmed, Plaintiffs brought the present action, which as stated above contends that the the 2004 Framework and the Basin Project violate the NFMA and NEPA both on a programmatic and site-specific basis.

## PROCEDURAL FRAMEWORK

■ Congress enacted NEPA in 1969 to protect the environment by requiring certain procedural safeguards before an agency takes action affecting the environment. The NEPA process is designed to "ensure that the agency ... will have detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir. 1998). The purpose of NEPA is to "ensure a process, not to ensure any result." *Id.* "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision-making to the end that the agency will not act on incomplete information, only to regret its decision after is it too late to

6. Documents prepared in conjunction with the Basin Project are contained within the second ten-volume portion of the record on

file herein, and are cited as "BASIN", followed by the Bates-stamped number.

correct." *Center for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir.2003). Complete analysis under NEPA also assures that the public has sufficient information to challenge the agency's decision. *Robertson v. Methow Valley Citizens*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1151 (9th Cir.1998).

 NEPA requires that all federal agencies, including the Forest Service, prepare a "detailed statement" that discusses the environmental ramifications, and alternatives, to all "major Federal Actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). An agency must take a "hard look" at the consequences, environmental impacts, and adverse environmental effects of a proposed action within an environmental impact statement ("EIS"), when required. *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). To determine whether an EIS is required, an agency may first prepare an environmental assessment ("EA"). The objective of an EA is to "[b]riefly provide sufficient evidence and analysis to determining whether to prepare" an EIS. 40 C.F.R. § 1508.9(a)(1). If the EA indicates that the federal action may significantly affect the quality of the human environment, the agency must prepare an EIS. 40 C.F.R. § 1501.4; 42 U.S.C. § 4332(2)(C).

 In the event an agency determines that an EIS is not required, it must, as the Forest Service did here with respect to the Basin Project, issue a FONSI detailing why the action "will not have a significant effect on the human environment." 40 C.F.R. § 1508.13. As is customary, the FONSI in this case is contained within the project EA. The EA must support the agency's position that a FONSI is indicated. *Blue Mountains*, 161 F.3d as 1214.

 NEPA does not mandate that an EIS be based on a particular scientific methodology, nor does it require a reviewing court to weigh conflicting scientific data. *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir.1985). An agency must be permitted discretion in relying on the reasonable opinions of its own qualified experts, even if the court might find contrary views more persuasive. *See, e.g., Kleppe*, 427 U.S. at 420, n. 21, 96 S.Ct. 2718. NEPA does not allow an agency to rely on the conclusions and opinions of its staff, however, without providing both supporting analysis and data. *Idaho Sporting Cong.*, 137 F.3d at 1150. Credible scientific evidence that contraindicates a proposed action must be evaluated and disclosed. 40 C.F.R. § 1502.9(b).

 In addition to arguing that the Forest Service violated NEPA in this case, Plaintiffs also contend that the Basin Plan violates the NFMA, which requires that "resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest Systems lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). Consequently, all activities in Forest Service forests, including timber projects, must be determined to be consistent with the governing forest plan, which is a broad, programmatic planning document. *See, e.g., Wilderness Society v. Thomas*, 188 F.3d 1130, 1132 (9th Cir.1999). If an EA or EIS adequately discloses such effects, NEPA's goal is satisfied. *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir.1996) (emphasis in original).

 Because neither NEPA nor NFMA contains provisions allowing a private right of action (*see Lujan v. National Wildlife Federation*, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) and

*Ecology Center Inc. v. United States,* 192 F.3d 922, 924 (9th Cir.1999) for this proposition under NEPA and NFMA, respectively), a party can obtain judicial review of alleged violations of NEPA only under the waiver of sovereign immunity contained within the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. *Earth Island Institute v. U.S. Forest Serv.,* 351 F.3d 1291, 1300 (9th Cir.2003).

Under the APA, the court must determine whether, based on a review of the agency's administrative record, agency action was "arbitrary and capricious," outside the scope of the agency's statutory authority, or otherwise not in accordance with the law. *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir.1994). Review under the APA is "searching and careful." *Ocean Advocates,* 361 F.3d at 1118. However, the court may not substitute its own judgment for that of the agency. *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), overruled on other grounds by *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)).

In reviewing an agency's actions, then, the standard to be employed is decidedly deferential to the agency's expertise. *Salmon River,* 32 F.3d at 1356. Although the scope of review for agency action is accordingly limited, such action is not unimpeachable. The reviewing court must determine whether there is a rational connection between the facts and resulting judgment so as to support the agency's determination. *Baltimore Gas and Elec. v. NRDC,* 462 U.S. 87, 105–06, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983), citing *Bowman Trans. Inc. v. Arkansas–Best Freight Sys. Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). An agency's review is arbitrary and capricious if it fails to consider important aspects of the issues before it, if it supports its decisions with explanations contrary to the evidence, or if its decision is either inherently implausible or contrary to governing law. *The Lands Council v. Powell,* 395 F.3d 1019, 1026 (9th Cir.2005).

## STANDARD

Summary judgment is an appropriate procedure in reviewing agency decisions under the dictates of the APA. *See, e.g., Northwest Motorcycle Assn. v. U.S. Dept. Of Agric.,* 18 F.3d 1468, 1471–72 (9th Cir. 1994). Under Federal Rule of Civil Procedure 56, summary judgment may accordingly be had where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are "no genuine issues of material fact in dispute." *Id.* at 1472. In cases involving agency action, however, the court's task "is not to resolve contested facts questions which may exist in the underlying administrative record," but rather to determine whether the agency decision was arbitrary and capricious as defined by the APA and discussed above. *Gilbert Equipment Co., Inc. v. Higgins,* 709 F.Supp. 1071, 1077 (S.D.Ala.1989); *aff'd, Gilbert Equipment Co. Inc. v. Higgins,* 894 F.2d 412 (11th Cir.1990); *see also Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir.1985). Consequently, in reviewing an agency decision, the court must be "searching and careful" in ensuring that the agency has taken a "hard look" at the environmental consequences of its proposed action. *Ocean Advocates v. U.S. Army Corps of Engineers,* 402 F.3d 846, 858–59 (9th Cir. 2005); *Or. Natural Res. Council v. Lowe,* 109 F.3d 521, 526 (9th Cir.1997).

## ANALYSIS

### I. NFMA CLAIMS

#### A. Applicable Regulations

In analyzing the viability of Plaintiff's NFMA claims against both the Frame-

work and the Basin Project, the Court must first determine the applicable NFMA regulations that apply in assessing the propriety of the Forest Service's actions.

First, with respect to the 2004 Framework, the Forest Service has conceded that the 1982 Rules apply to issuance of the Framework. *See* Fed. Defs.' Mem. in Supp. of Cross Mot. for Summ. J. at p. 16, n. 17.

Because the 2004 Framework was initiated before the transition period established by the 2005 regulations,[7] the Forest Service elected to use the 1982 regulations to guide the plan amendment process. *See, e.g.,* SNFPA 4056 ("The Responsible Official elected to remain under the 1982 regulations. The transition provisions of the 2000 Regulations, which were in effect when the Forest Service proposed and adopted the 2004 Framework, authorized the Regional Forester to continue or initiate forest plan amendments under the 1982 regulations.") *See* 36 C.F.R. § 219.35 (2004); 67 Fed.Reg. 35,431, 35,434 (May 20, 2002). Because the 2005 regulations provide the Forest Service with discretion to apply the 1982 plan amendments initiated prior to January 5, 2005 transition period for applying the new regulations, it was clearly not improper for the Forest Service to apply the 1982 regulations to the 2004 Framework. *See* 36 C.F.R. § 219.14(e) (plan amendments initiated before said transition period "may continue to use the provisions of the planning regulations in effect before November 9, 2000 . . . or may conform to the requirements" of the 2005 regulations).

The record indicates that the Regional Forester made the decision to apply the 1982 regulations that applied before 2000. *See* SNFPA 3010 ("My decision confirms with the 1982 planning regulations (36

CFR 219) that implement [NFMA]."); SNFPA 4056 ("The 2004 [Framework] was prepared under the NFMA and the 1982 implementing regulations of the NFMA.").

The Ninth Circuit has consequently confirmed that the 1982 regulations apply to the 2004 Framework. In *Natural Res. Def. Council v. U.S. Forest Serv.,* 421 F.3d 797, 800 n. 3 (9th Cir.2005), the court applied the 1982 regulations in reviewing the forest plan, for the Tongass National Forest, a programmatic document similar to the 2004 Framework at issue here. More recently, in *Earth Island Institute v. U.S. Forest Serv.,* 442 F.3d 1147, 1153 (9th Cir.2006), the Ninth Circuit stated unequivocally that "we conclude that NFMA regulations promulgated in 1982 apply to the 2001 Framework and 2004 Supplement."

While providing clear guidance on the applicability of NFMA regulations to the 2004 Framework, the 2005 regulations fail to specifically address what regulations govern site-specific projects, like the Basin Project, that were approved prior to the transition period. In the absence of that regulatory guidance, the Forest Service urges the Court to apply case law suggesting that statutes and regulations may be applied retroactively if doing so would not impact interests already vested through reliance on previous provisions. *See, e.g., Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

The Forest Service explicitly developed the Basin Project pursuant to the 1982 NFMA regulations, however. *See* BASIN 3726 (stating that the Basin Project is consistent with the 1982 regulations "which remain in effect at this time"). This makes it unnecessary to resort to the

---

7. See 68 Fed.Reg. 16758 (April 7, 2003) (notice of intent filed to consider amendment to the 2001 Framework); 36 C.F.R. § 219.14(c) (defining "initiation" to mean the issuance of the notice of intent).

guidelines delineated in *Landgraf*, which do not apply where the proper reach of new rules has already been expressly prescribed, since in that instance "there is no need to resort to judicial default rules." *Id.* at 280, 114 S.Ct. 1483. Ninth Circuit law also indicates that the 1982 regulations govern judicial review of the Basin Project. *See, e.g., Oregon Natural Resources Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir.2007); *Environmental Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1017 n. 8 (9th Cir.2006).

Even were the 2005 regulations to be applicable, which the Court does not believe to be the case, those regulations have recently been enjoined on a nationwide basis by the Northern District. In *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F.Supp.2d 1059, 1076, 1090, 1097 (N.D.Cal.2007), the court held that the Forest Service's adoption of the 2005 regulations violated both NEPA and the Endangered Species Act, and enjoined the Service from implementing or utilizing the 2005 rules on a nationwide basis.[8]

Given the Court's conclusion that the 1982 regulations apply both on the programmatic level of the 2004 Framework and the site-specific focus of the Basin Project, it must next consider to what extent claims made in the context of the 1982 rules are ripe for adjudication.

## B. Ripeness

 Several parties intervening in this litigation[9] have argued that Plaintiffs' NFMA challenges are not ripe because they constitute challenges to the entire 2004 Framework, rather than justiciable site-specific challenges. (*See, e.g.,* CSIA's

Opp. to Pls.' Mot. for Summ. J., pp. 6–9). The judicial ripeness doctrine is properly invoked to ensure that courts avoid premature adjudication of disputes by refraining from any judicial interference until a administrative decision has been formalized and causes concrete ramifications to the challenging parties. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). By leaving programmatic decisions and relief to the two political branches of government, and addressing only site-specific challenges with real and palpable ramifications, the appropriate deference to the separation of powers vital to our system of government is properly respected. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891–94, 899, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

With this analytical structure in mind, we turn to the NFMA claims asserted by Plaintiffs against both the 2004 Framework and the Basin Project. The Supreme Court, in *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921, has held that an NFMA-based facial challenge to the overall provisions of a forest plan is not ripe when premised on allegations of potential environmental hardship. By permitting judicial review in a later as-applied challenge to a specific implementation of the plan, judicial review and relief may still be granted in advance of any concrete environmental injury. *Id.* at 734, 118 S.Ct. 1665. Similar NFMA challenges to forest planning rules in the abstract, divorced from the parameters of intended action,

---

**8.** A later decision by the *Citizens for Better Forestry* court made it clear that the injunction applied on a nationwide basis. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 2007 WL 1970096 at *19 (N.D.Cal. July 3, 2007).

**9.** Intervenors include the California Cattlemen's Association, the California Ski Industry Association ("CSIA"), Quincy Library Group and Plumas County, and the Tuolumne County Alliance for Resources and Environment ("TuCare"), among others.

are similarly unripe. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 977 (9th Cir.2003). In addition, forest-wide monitoring claims are also not yet appropriate for judicial review, since the wildlife information the Forest Service has at any given point in time does not produce direct injury in any meaningful way unless and until ground-disturbing activities are imminent. *Ecology Ctr. v. U.S. Forest Serv.*, 192 F.3d 922 (9th Cir.1999). To find otherwise would permit the court to engage in theoretical speculation about the possibility of future injury—just the sort of "abstract disagreement over administrative policies" that the ripeness doctrine seeks to avoid. *Ohio Forestry*, 523 U.S. at 736, 118 S.Ct. 1665.

 With respect to the 2004 Framework, this means that Plaintiffs' challenge to the overall 2004 Framework, to the extent that program wide non-compliance with wildlife viability and population monitoring are alleged, is unripe. The fact that the Basin Project raises issues stemming from the 2004 Framework does not render the entire Framework amenable to judicial review and relief. The Supreme Court, in *Lujan, supra*, made this clear:

> "[T]he flaws in the entire 'program'. . . . cannot be laid before the courts for wholesale correction under the APA, simply because one [implementing] action' is ripe for review [and] adversely affects one of [plaintiff's] members. The case-by-case approach that this requires is understandably frustrating to an organization . . . [whose goal is] across-the-board protection of . . . .wildlife and the streams and forests that support it. But this. . . . remains the normal, mode of operation of the courts. . . . . [W]e intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect."

*Lujan v. NWF*, 497 U.S. at 893–94, 110 S.Ct. 3177.

To the contrary, the only ripe suit entails "site-specific actions as the focus of the challenge," and a showing of a "site-specific injury causally related to an alleged defect in the forest plan" is required before the court considers the legality of a programmatic document like the Framework in the context of the site-specific challenge. *Wilderness Soc'y v. Thomas*, 188 F.3d 1130, 1133–34 (9th Cir.1999). Any relief accorded by the court is limited to the scope of the justiciable site-specific controversy. *Lujan v. NWF*, 497 U.S. at 894, 110 S.Ct. 3177 (review and relief "only . . . to the extent" required to adjudicate a site-specific action).

Here, the effects of forest treatments contemplated by the Basin Plan represent a tangible, rather than theoretical injury. Moreover, to the extent that the lawfulness of the Basin Plan hinges on whether or not site specific practices are premised on the propriety of forest-wide management practices, both the Basin Plan itself and the 2004 Framework upon which it relies may be scrutinized. *Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1067 (9th Cir.2002).

 As *Cuddy Mountain* recognizes, it must nonetheless be emphasized that not all forest-wide practices can be challenged on the coattails of a site-specific action; there must be a causal relationship between the lawfulness of the site-specific action and the practice challenged. *Id.*

As a practical matter, this means that the 2004 Framework may be challenged under NFMA only to the extent its provisions are implicated within Plaintiff's challenge to the site-specific Basin Project. All other general challenges to the 2004 Framework as a programmatic document are unripe.

## C. Failure to Maintain Viable Species Populations

Plaintiffs maintain that the record in this case demonstrates the inadequacy of the 2004 Framework to maintain viable species, and particularly targets the inadequacy of the Framework to ensure sufficient populations of the California spotted owl, the Pacific fisher, and the American marten. Plaintiffs point to the fact that the 1982 NFMA regulations require the Forest Service to manage wildlife habitat so as "to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19; *see also Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 2004 WL 1592606 at *2 (D.Or.2004) ("[NFMA] imposes a substantive duty on the Forest Service to provide sufficient habitat to maintain viable, well-distributed populations of wildlife species throughout their existing ranges."). By enforcement of these alleged NFMA violations under NEPA, Plaintiffs urge the Court to find the 2004 Framework arbitrary and capricious, and to set aside all projects approved in accordance with the Framework, including the Basin Project. *See Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir.2002) ("If the forest plan's [viability] standard is invalid ... then the timber sales that depend upon it to comply with [NFMA] are not in accordance with law and must be set aside.").

As discussed above, however, assessment of the validity of such viability standards is necessarily limited by the scope of the site-specific project at issue. The plan-level challenge to the Framework is therefore confined to the plan-level issues found in the Basin Project. *See Ohio Forestry*, 523 U.S. at 734, 118 S.Ct. 1665. Since we have also established that the 1982 planning regulations apply, we hence analyze the viability issues raised by the Basin Project, with the 2004 Framework coming into play only to the extent its planning directives in that regard are manifested by Basin.

Another fundamental concept that guides our viability assessment is the notion that forest management cannot be guided by a single, overarching objective that eclipses consideration of other legitimate forest uses. Such multiple use compromises are implicit in the overall mandate of the NFMA. *See* 16 U.S.C. § 1604(g)(3)(B) (species diversity to be addressed in light of "overall multiple-use objectives"); 36 C.F.R. § 219.27(a)(6) (2000) (species habitat to be maintained and improved "to the degree consistent with multiple-use objectives"); 36 C.F.R. § 219.26 (provide for diversity consistent with multiple-use objectives of the planning area); 36 C.F.R. § 219.27(a)(5) (forest plans should "maintain diversity of plant and animal communities to meet overall multiple-use objectives"); *see also Lands Council v. McNair*, 537 F.3d 981, 989–90 (9th Cir.2008) (Congress has "consistently acknowledged that the Forest Service must balance competing demands in managing National Forest Service lands"); *Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401, 1404 (9th Cir.1996).

In examining the viability of the three species Plaintiffs' claim is compromised by the Basin Plan, and in turn its programmatic blueprint, the 2004 Framework, then, considerations of multiple use must be kept in mind. The Forest Service has substantial discretion in how to balance multiple resource use on its lands, even to the extent that such uses intersect with viability concerns. *See* 16 U.S.C. § 529 (directing Secretary of Agriculture to administer forest lands for multiple uses and sustained yield); *Lands Council v. McNair*, 537 F.3d at 989–90 ("[T]he NFMA is explicit that wildlife viability is not the Forest Service's only consideration

when developing site-specific plans for National Forest System lands"); *Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir.1979).

■ Significantly, as long as all relevant considerations are properly weighed and analyzed, the Forest Service can decide not to adopt a course intended to facilitate viability to the greatest extent possible if such a course would compromise other multiple use objectives. *See Seattle Audubon Soc. v. Moseley*, 80 F.3d at 1404. The language of the 1982 NFMA regulations themselves, at 36 C.F.R. § 219.19, requires only that sufficient habitat be managed to maintain a "viable population" of desired species, with that term defined one which has a sufficient number of reproductive individuals to insure that the species' "continued existence is well distributed in the planning area." This does not require that species' numbers be maximized by adoption of the most protective forest management measures. Instead, the Ninth Circuit has recognized that § 219.19 simply sets a minimum threshold for ensuring enough reproductive individuals "so that the species can survive." *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002).

The Basin Project's BA/BE analyzed the amount of suitable wildlife habitat currently available within the project area and, after comparing that assessment with habitat changes resulting from implementation of the project, concluded that 72 percent of the acreage comprising the Basin planning area would remain good owl, fisher and marten habitat even after contemplated fuel treatment activities had been completed. *See* BASIN 3539 and 3553 (owl PACs, SOHA,[10] and additional nesting and foraging habitat total 37,833 acres in the 52,570 acre analysis area); BASIN 3695 (projected changes in CWHR[11] habitat types).

This number in and of itself suggests that completion of the Basin Project will leave vast amounts of suitable habitat untouched, a factor which would appear to bode well for continued viability of the three species at issue within the area of the Basin Project. Significantly, the Ninth Circuit's recent decision in *Lands Council v. McNair* reaffirms that the amount of suitable habitat for a particular species may properly be used as a proxy for the viability of that species. 537 F.3d at 995–96.

Importantly, too, other factors considered by the Forest Service in approving both the Framework and the project itself bolster that conclusion. With regard to the California spotted owl, the 2003 Meta-analysis of all existing demographic data found the owl to be, within a 95 percent confidence level, a stable population and not declining as was previously believed. BASIN 3720. Moreover, the latest research considered by the Forest Service in considering the 2004 Framework indicated 1) that owls utilize a wider variety of habitat for foraging (namely, habitats with canopy coverage of 40 percent or greater) than previously thought; 2) that owls are being protected on private timberlands pursuant to state law; 3) that owls are not suffering from any demonstrable population declines; and 4) that owls are suffering habitat loss from wildfires. SNFPA 3099, 3213–18.

The Herger–Feinstein Quincy Library Group ("HFQLG") Act, of which the Basin Project is a part, is more protective of owls than either the 2001 or 2004 Frameworks because it completely prohibits logging in

---

10. Spotted Owl Habitat Areas ("SOHA") are defined as designated stands of owl habitat, comprising at least 1,000 acres located within a 1.5 mile radius of a nesting site.

11. The California Wildlife Habitat Relationship ("CWHR") system assigns categories based on tree size and canopy cover.

owl PACs. BASIN 1077. Because owls appear to be widely distributed throughout both the Plumas National Forest and the Basin Project area (BASIN 1168, 3694), and given the protection accorded to the most crucial habitat area (PACs and SOHA), the Forest Supervisor reasonably concluded that owl viability could be achieved while also carrying out the multi-use objectives of the HFQLG Act. BASIN 3644–45. This was believed to be particularly true inasmuch as overall owl habitat is projected to increase under the 2004 Framework (*see* SNFPA 3340), with a larger number of old trees resulting from both tree retention and, by virtue of anticipated forest thinning, a decreased loss of large trees to stand-replacing fire. See SNFPA 3346, 3316. By decreasing the risk of catastrophic wildfire through such selective thinning, lesser amounts of suitable old-growth owl habitat are subject to destruction while at the same time promoting multiple-use objectives like timber production and protection to human community resources. This multi-use synergy is consistent with NFMA mandates, and approval of the Basin Project does not run afoul of statutory viability standards applicable to the California spotted owl under these circumstances.

As indicated above, the other two species implicated by Plaintiffs, the American marten and the Pacific fisher, are both forest carnivores. Although the BA/BE for the Basin Project discussed both population and habitat data concerning four forest carnivores, including both the fisher and marten, only the marten has been sighted at locations within the Plumas National Forest where the Basin Project is situated. BASIN 3353. The BA/BE explains that systematic surveys of the pro-

ject area, encompassing "approximately 50% of the forest, have failed to reveal either the presence of fisher [12] or the other two absent furbearer species, the Sierra Nevada red fox and the wolverine." BASIN 3554.

Because the fisher does not appear to inhabit the Basin Project only, it was unnecessary for the Forest Service to have analyzed the impacts to the Fisher as to that site-specific project, and for the reasons stated above any generalized challenge to the 2004 Framework as a whole with respect to fishers would be unripe. Nonetheless, as the Framework points out, the owl and fisher share many of the same preferred old-growth habitat attributes, and hence the protections afforded to the owl as would appear to benefit any potential fisher population as well. See SNFPA 2997, 3315.

With regard to the marten, the Forest Service looked at the fact that marten will use harvested areas for habitat, as long as adequate ground cover and downed logs remain onsite. SNFPA 3325. This corresponds with the group selection units which figure prominently in the Basin Project as well the HFQLG Act area as a whole, and the SEIS concluded that those units were "within the size range of openings used by marten." SNFPA 3329. In addition, a network of high quality habitat for forest carnivores, including martens, has been delineated within the SEIS, which "provide[s] connectivity to marten populations to the north and south of the HFQLG" area. *Id.* Additionally, Scientific Analysis team guidelines applicable to the HFQLG Act establish treatment buffers around riparian areas, which are of "high importance to marten" and are often used

**12.** Data contained within the 2004 Framework indicates that numerous survey efforts on an even larger scale for the fisher have "failed to find.... this species on Forest Service lands in the area between Mount Shasta and Yosemite National Park." SNFPA 986. *See also* SNFPA 957 (fishers are "absent north of Yosemite National Park").

as corridors. SNFPA 3329; 16 U.S.C. § 2104 note, Sec. 401(c)(2)(a).

Perhaps most importantly, in concluding that viability for all three species would be maintained by the Basin Project, the Forest Service relied upon the fact that forested habitats affected by the project would be a relatively small 3.6 percent of the total project areas. Additionally, surveys are required for both owl, fisher, and marten prior to commencement of a site-specific project like Basin. SNFPA 3698, 3699. If any new owl territories of fisher or marten dens are located, the Forest Service has developed an adaptive plan to respond to such findings, a plan that could include changing treatment prescriptions, excluding project activity from implicated harvest units, or proceeding under limited operating periods ("LOPs"), which are designed to reduce potential harm to wildlife during critical seasons like nesting or fawning. *Id., see also* SNFPA 3537.

Because the Basin Project was deemed to be fully consistent with the terms of the 2004 Framework, the Basin EA properly tiered its analysis to the 2004 Framework SEIS, and could maintain viability standards by following the 2004 Framework standards and guidelines discussed above. *See* BASIN 3645, 3663, 3683; see 40 C.F.R. § 1502.20 (encouraging tiering to "eliminate repetitive discussion about the same issues and to focus on the actual issues ripe for decision"); *see also Portland Audubon Soc'y v. Lujan,* 884 F.2d 1233, 1239 (9th Cir.1989) (upholding an Environmental Assessment's tiering to a programmatic EIS).

In sum, given the relatively small percentage of suitable habitat affected by the Basin Project for any of the species implicated by Plaintiffs in their NFMA challenge to the Basin Project, as well as the consideration accorded for multiple use objectives, the Forest Service did not act arbitrarily or capriciously in finding that the Project would maintain species viability concurrently with meeting other multiple-use objectives. The mandates of NFMA was therefore satisfied and the Forest Service is entitled to summary adjudication as to Plaintiffs' First and Fourth Claims, which allege that the Forest Service failed to maintain viable populations of California spotted owls, Pacific fishers and American martens throughout the Sierra Nevada planning area.

### D. Population Monitoring

Plaintiffs also allege that the Forest Service adopted the 2004 Framework, and thereafter the Basin Project, in the absence of information required under the NFMA for Management Indicator Species ("MIS") and Species at Risk ("SAR"). Plaintiffs point to the fact that under the 1982 NFMA regulations, the Forest Service is required to monitor population trends for each MIS. *See* 36 C.F.R. § 219.19(a)(6) ("Population trends of MIS "will be monitored and relationships to habitat changes determined." "). According to Plaintiffs, the application regulation requires MIS population inventories consisting of quantitative data. 36 C.F.R. § 219.26 ("Inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition.").

Consistent with the regulations, the 2001 Framework designated certain MIS for the Sierra Nevada planning area in Exhibit E of its final EIS. Appendix E goes on to indicate the specific species "for which population trend data is expected to be obtained" by way of population monitoring. FEIS Vol. 4 at E–64–66, 76, 98–100. The Forest Service incorporated and readopted Appendix E from the 2001 FEIS when it approved the 2004 Framework. *See* SNFPA 3060.

 While Plaintiffs attempt to challenge the Forest Service's purported failure to perform the required monitoring on a Framework-wide basis, as stated above the only ripe NFMA claims are those that relate specifically to the Basin Project as a site-specific plan.[13] Accordingly, the only MIS or SAR at issue are those that are found within the Plumas National Forest plan in which the Basin plan area is located. Species not identified in the Plumas Forest Plan do not "play[ ] a causal role" in the Basin Project. *Ohio Forestry*, 523 U.S. at 734, 118 S.Ct. 1665. Consistent with this conclusion, the SEIS itself recognizes that "MIS are identified in the Land and Resource Management Plans of *each national forest ...*" SNFPA 3238, emphasis added. Therefore, as a fundamental matter, there can be no duty to obtain or consider population monitoring data for MIS that are not found within the Plumas National Forest plan. The Plumas Forest Plan lists fifteen species and species groups as MIS: bald eagle, golden eagle goshawk, peregrine falcon, prairie falcon, spotted owl, Canada goose, woodpecker group, deer group, gray squirrel, marten, trout group, largemouth bass, sensitive plant group, and willow-alder community. BASIN 2917. The Basin EA considered effects upon the habitat of all of these fifteen Plumas MIS. Since it appears uncontroverted that actual quantitative population monitoring was not performed,[14] however, the question remains whether the Forest Service's failure in that regard violates the NFMA.

The Forest Service initially argues that it met its monitoring requirements by engaging in an assessment of species habitat as a proxy for changes in population. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1250–51 (9th Cir. 2005); *Inland Empire*, 88 F.3d at 759, 763; *Utah Environmental Congress v. Bosworth*, 372 F.3d 1219, 1224 (10th Cir.2004). Although habitat assessment may suffice for actual population monitoring in some situations (where for example some actual population data has already been obtained), here there appears to be a paucity of numerical data, and in that instance

13. The Court disagrees with Plaintiffs' assertion that the Forest Service had a duty to collect quantitative population monitoring data prior to the promulgation of a forest plan amendment like the 2001 or 2004 Framework. The applicable 1982 regulations state only that population trends "will be monitored and relationships to habitat change determined," not that population monitoring must be conducted before even approving directives for future forest management. *See* 36 C.F.R. § 219.19(a)(6) (2000).

14. The Forest Service admits in the FSEIS for the 2004 Framework, for example, that population data exists only "for some of the species considered in the analysis" and is "generally lacking" for MIS. SNFPA 3242. With respect to the owl, however, ongoing demographic studies were analyzed in the SEIS, and fisher monitoring data were collected during the field seasons falling within fiscal years 2002 and 2003. SNFPA 3151–52, 3156. The documents prepared in support of the Basin Project are similarly devoid of much quantitative data demonstrating population trends for most species. With regard to the California spotted owl, however, the Basin Project record indicates that Forest Service researchers have been monitoring owl populations in the Basin Project area and other administrative study areas annually since 2002. BASIN 3551. The results of these and other pre-project owl surveys are disclosed in the BA/BE at BASIN 3551–52. (3151–52, 3156). In addition, the Basin BA/BE discloses that protocol-level surveys of the Basin Project area in 2003–04 showed no sign of the presence of forest carnivores. Hence, at least with regard to the three species focused on by Plaintiffs with regard to monitoring, the spotted owl, American marten and Pacific fisher, it appears that monitoring was performed, and that monitoring in conjunction with minimal disturbance to suitable habitat was sufficient for the Forest Service to rely on habitat with regard to those species.

NFMA requirements are not ordinarily satisfied. See *Sierra Club v. Martin,* 168 F.3d 1, 4–6 (11th Cir.1999). This is particularly the case given the fact that Appendix E to the 2001 and 2004 Frameworks appears to require population monitoring as opposed to habitat analysis. *See Eubanks,* 335 F.Supp.2d at 1082.

The Court nonetheless recognizes that the Ninth Circuit has indicated that monitoring directives contained in forest plans like the 2001 and 2004 Frameworks are not judicially enforceable. *See Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 67–72, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (species monitoring in designated areas, "like the other 'will do' projections of agency action set forth in land use plans—are not a legally binding commitment"). On the other hand, however, a slightly more recent Ninth Circuit decision, *Earth Island Inst. v. U.S. Forest Serv.,* 442 F.3d 1147, 1153 (9th Cir.2006), appears to suggest otherwise. In finding that approval and implementation of a site-specific project was contrary to the NFMA and governing provisions of the forest plan, the *Earth Island* court explained that because the Frameworks expressly required population monitoring, "it is difficult to see how distribution data could effectively be gathered in the absence of actual population monitoring." *Id.* at 1175–76.

■ The recent enactment of a new forest plan amendment applicable to all the national forests in the Sierra Nevada region (the "2007 Amendment"), however, removes any uncertainty in this regard, since the 2007 revision expressly removes the population monitoring requirements contained in the 2001 and 2004 Frameworks.[15] The 2007 Amendment is author-

ized by NFMA provisions that permit the Forest Service to amend forest plans "in any manner whatsoever." 16 U.S.C. § 1604(f)(4). This broad delegation of authority gives the Forest Service discretion to determine whether forest plan amendments can be applied retroactively. *See Forest Guardians v. Dombeck,* 131 F.3d 1309, 1312 (9th Cir.1997) ("Congress intended to grant the Secretary discretion in amending existing forest plans, including the discretion to determine how those amendments will be implemented," whether prospectively or retroactively).

The 2007 Amendment recognizes that current MIS lists and associated monitoring "are simply not working for a variety of reasons, including inclusion of species whose population changes are not clearly related to habitat changes on National Forest lands, and inclusion of species not present in sufficient numbers to allow collection of meaningful information." The 2007 Amendment changes the standard for evaluating whether a site-specific project like the Basin Project complies with MIS forest plan requirements in general, and further provides a specific exemption for pending projects like Basin where an EA has been completed and a decision made. For those projects, the 2007 Amendment makes it clear that

"obligations relating to MIS will have been met if the project record discloses impacts the project may have on MIS habitat or populations, using the MIS list in effect at the time the MIS analysis was conducted. No other project-level analysis or disclosure requirements shall apply to these project, including any particular requirements related to MIS set forth in Appendix E of the 2001

---

**15.** The 2007 Amendment was issued following preparation of an environmental impact statement and after the public was afforded the appropriate opportunity for involvement

through commentary and feedback. *See* 2007 Amendment, Ex. "A" to Fed. Defs.' February 7, 2008 Notice of Changed Circumstances, p. 9–10.

Sierra Nevada Forest Plan Amendment FEIS or the individual forest plans covered by this amendment. All such requirements are superseded by this direction."

2007 Amendment, Ex. "A" to Fed. Defs.' Notice of Changed Circumstances, p. 15.

With regard to Species at Risk ("SAR"), a classification with respect to which Plaintiffs argue that Forest Service also ran afoul of NFMA provisions, the 2007 Amendment states unequivocally that there are no legal requirements for monitoring SAR. *Id.* at 13.

Given the unfettered discretion granted by Congress to the Forest Service, pursuant to 16 U.S.C. § 1604(f), to amend forest plans "in any manner whatsoever", and the fact that such discretion has been expansively interpreted by the Ninth Circuit as permitting amendment either prospectively or retroactively (*Dombeck,* 131 F.3d at 1312), this Court concludes that the 2007 Amendment renders any monitoring controversy concerning the Basin Project moot. *See Colorado Off Highway Vehicle Coalition v. U.S. Forest Serv.,* 357 F.3d 1130, 1133–34 (10th Cir.2004) (arguments based on failure to comply with earlier version of Forest Plan rendered moot by issuance of new Plan which superseded its challenged predecessor); *see also Forest Guardians v. U.S. Forest Serv.,* 329 F.3d 1089, 1096 (9th Cir.2003) (challenge to earlier biological opinion rendered moot by issuance of superseding version).

Plaintiffs' attempt to distinguish the *Colorado Off Highway* case on grounds that in that case, unlike the present matter, the Plaintiff failed to challenge the validity of the amended plan. The Court does not view that factor as dispositive given *Colorado's* fundamental holding that no legal attack can be made against an administrative decision superseded by issuance of a new Forest Plan. That mootness holding applies equally to this case. *Colorado Off*

*Highway Vehicle Coalition,* 357 F.3d at 1134.

The Court is similarly unpersuaded by Plaintiffs' contention that the monitoring issue remains viable because retroactive application of the 2007 Amendment regarding MIS monitoring is contrary to NFMA and because the Amendment itself is inconsistent with the applicable regulations. See Pls.' Reply to Notice of Changed Circumstances, 3:25–4:2. First, as already indicated, retroactive application of the applications if permissible given the broad sweep of 16 U.S.C. § 1604(f) and the Ninth Circuit's interpretation of the statute in *Dombeck.* Additionally, as also stated above, the 1982 regulations require that population trends of MIS "will be monitored and relationships to habitat changes determined." 36 C.F.R. § 219(a)(6). The regulation does not specifically dictate how monitoring should be accomplished, and the Ninth Circuit has held, even in the face of the 1982 regulations, that actual monitoring need not be conducted where the Forest service has utilized a reliable alternative methodology instead. *See Inland Empire Pub. Lands Council v. U.S. Forest Serv.,* 88 F.3d 754, 763 (9th Cir.1996) (finding that the Forest Service did not violate NFMA in analyzing habitat instead of conducting actual population monitoring); *see also Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1250–51 (9th Cir.2005) (recognizing circumstances where Forest Service need not conduct actual population monitoring); *Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1154 (9th Cir.1998) (identifying instances where habitat analysis can be used as a proxy for population monitoring). Consequently Plaintiffs' argument that anything less than monitoring cannot satisfy NFMA is misplaced. Defendants are entitled to summary adjudication as to Plaintiffs' Second Claim, which alleges that the 2004 Framework and Basin Project

were adopted in the absence of required population trend data.

## II. NEPA CLAIMS

As set forth above, since Plaintiff's NFMA claims are substantive in nature, their NFMA challenges to the 2004 Framework as a whole are only ripe for review to the extent a site-specific project like Basin brings specific provisions of the Framework to the forefront. NEPA, however, unlike NFMA, imposes procedural rather than substantive requirements. Consequently, the 2004 Framework can be properly scrutinized in toto to ensure that those procedural mandates have been satisfied.

As also indicated above, NEPA only requires that federal agencies establish a consistent process for considering environmental impacts, and take a "hard look" at the consequences of such impacts. *Vermont Yankee Nuclear Power v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). So long as "the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.*

### A. Failure to Adequately Consider Direct and Indirect Impacts to Old–Forest Species

Plaintiffs' Fifth Claim alleges that the 2004 Framework violates NEPA by not adequately analyzing impacts to species like the owl, fisher and marten, which all prefer old-growth forest conditions. Pls.' Second Am. Compl., ¶¶ 113–119.

In analyzing whether the Forest Service was deficient in this regard, it is important to initially consider the extent to which the 2004 Framework is expected to impact old-growth habitat. The record discloses that any such effect appears minimal. No treatments under the Framework are projected for some 86 percent of Old Forest Emphasis Area ("OFEA"). SNFPA 3332. Treatment in Protected Activity Centers ("PACs"), which, as indicated above, comprise 300 acre parcels around each known owl nest or roosting site, are very limited throughout the Framework area [16] and virtually nonexistent in the HFQLG area where most of the logging is scheduled to take place. SNFPA 2997; 3121–3122; 3336. Moreover, no treatment of any kind will occur within 80 percent of the 1,000 acre Home Range Core Areas ("HRCAs") set aside in conjunction with each PAC, and to the limited extent such treatments occur they are permitted only outside a 500 acre radius surrounding the PAC. *Id., see also* SNFPA 3334. Even outside of HRCAs and PACs, the more intensive vegetation treatments under the 2004 Framework are likely to reduce canopy cover to 40 percent on only 8 percent of acres treated currently at 50 percent canopy cover or greater. SNFPA 3344. Treated areas will retain landscape features recognized as being important to old-forest dependent species, like larger trees (in excess of 30 inches in diameter), snags, and 40 percent plus canopy. SNFPA 2995; 2997; 3341.

Finally, in comparing the 2001 and 2004 Frameworks, there is a negligible difference in the short run between 2001 and 2004 Frameworks as to the available acres

---

**16.** Under the 2004 Framework, the maximum of PAC acres that could be affected is 5 percent per year and 10 percent per decade. SNFPA 3334. Only 4 percent of PAC acres under 2004 Framework would be treated within 26 percent of existing PACs. SNFPA 3350. All known owl nesting sites would be protected and PACs would be established for newly discovered sites. SNFPA 3334. With respect to the 1,321 existing PACs established through 2002, they would be retained and treatment avoided to the extent possible. SNFPA 2997; 3121–3122; 3336.

of late seral stage forest, with an overall increase in the long term (60 plus years). SNFPA 3327.

On the basis of the quantified habitat impact disclosed by the 2004 Framework, then, the effect of the 2004 Framework on old-forest species appears negligible. Plaintiffs nonetheless claim that the short-term effects upon such species have not adequately been disclosed for purposes of NEPA.

Any consideration of the effects of vegetation treatments in the Sierra Nevada necessarily involves a difficult balancing act between the short-term risk that some old-growth species may be displaced by any habitat disturbance, and the longer term risk that without reducing forest density through thinning and logging operations, stand-replacing wildfires may eliminate suitable habitat in its entirety. The FSEIS for the 2004 Framework specifically recognizes that it is a very difficult task to find the best way to protect old forest dependant species and to increase and perpetuate old forest ecosystems, while at the same time addressing the desperate need for forest intervention to reduce the risk of fuel loads feeding catastrophic fires. SNFPA 2995. A thinning program to reduce the risk of catastrophic wildfire will reduce the likelihood of stand-replacing fires in old growth areas in the future. SNFPA 2995, 3083; 3266, 3336.

Significantly, as the FSEIS also recognizes, recent fire seasons illustrate the risks from inaction as the number and severity of acres burned in wildfires continues to increase, with tragic losses to communities, their people and resources, as well as to wildland firefighters. More-over, to the extent that forests are overstocked and drought conditions are present, an overall lack of sufficient moisture makes forest drier and not only more susceptible to fire but also prone to insect and disease damage. SNFPA 2996. The Forest Service has the unenviable task of attempting to simultaneously weigh these significant competing considerations with the risks, both long and short term, to old-forest species like the owl, fisher and marten.

Despite Plaintiffs' claim that the 2004 Framework fails to provide enough analysis of its likely impacts to wildlife, especially in short run, the SEIS does recognize the importance of addressing short term impacts. The importance of consideration short term impacts on the owl is specifically recognized. *See* SNFPA 3327, 3337 ("With regard to owl population persistence, the short-term effects of management activities are believed to be most relevant.... and are highlighted in this effects analysis."), see also SNFPA 3339–3345. The FSEIS additionally recognizes that logging treatments "over the short-term (20 years) may introduce some unknown level of risk to the California spotted owl population." SNFPA 3340.

The 2004 Framework nonetheless attempts to mitigate that risk, while at the same time meeting not only the long term objective of long-term habitat preservation through the reduced risk of stand-replacing fire, but also the other multi-use considerations enumerated above. Although uncertainty remains concerning rangewide population trends, there is no definitive evidence that overall owl populations are decreasing across the Sierra Nevada. SNFPA 3214.[17] The 2003 meta-analysis

---

**17.** In addition, the United States Fish and Wildlife Service ("FWS") concluded from an analysis conducted by both the FWS and the Forest Service that "there was no clear statistical evidence to show that the [California spotted] owl was decreasing across its range."

SNFPA 3995. FWS determined that in the absence of demonstrated effects of fuel treatments in PACs and foraging areas, and considering that any potential negative impacts are also accompanied by positive effects from

conducted by spotted owl biologists, which includes the only demographic studies of owl population trends, survival and reproduction over the previous 7 to 12 years, recommends adaptive management experiments to evaluate the effects on the owl of silvicultural treatments designed to reduce fire risk. SNFPA 3152. Adaptive management strategies are "intended to improve scientific knowledge regarding the fire and fuels strategy as well as habitat relationships and vegetation management effects on California spotted owls." SNFPA 3608. Adaptive management encourages scientific scrutiny so that elements of the plan can be adjusted to "better balance management of the California spotted owl with management for other resources and activities." *Id.*

The 2004 Framework does adopt adaptive management strategies, which permit the Forest Service to respond to any short-term impacts as they are ascertained. The California Spotted Owl Response Module, for example, is designed to provide information on treatment effects at both the individual site and population level scales in addressing numerous issues, including population density, trends, habitat suitability, reproduction and survival using radio telemetry and sampling techniques. SNFPA 3155. The 2004 Framework indicates that funds have been provided to execute a total of five modules that comprise this integrated research project, which significantly includes examination of effects not only on the owl but also on small mammal habitat associations (presumably including the fisher and marten) and vegetation response to fuel treatments in general. *Id.*

In addition to using adaptive management strategies as a way of managing short-term impacts, the 2004 Framework also utilizes modeling projections to aid in a thorough assessment of such impacts. A comparative analysis was conducted on late-seral stage forest in the short term, including years 0 through 20. SNFPA 3326–3327. Through such projections, the Forest Service predicted that the amount of old forest is projected to increase across the bioregion in the short term, "despite treatments in approximately 14 percent of old forest emphasis areas." SNFPA 2996, 3602.

While the Forest Service's use of modeling projections to predict both short and long-term impacts is criticized by Plaintiffs as unreliable, in fact the FSEIS includes an appendix that discloses potential errors in modeling projections. SNFPA 3649–50. Modeling is a legitimate projection tool where supported by a reasonable scientific basis, and the Court concludes that such basis is present here. *See Lands Council v. McNair,* 2008 WL 2640001 at *8.

The Forest Service's decision to proceed forward with vegetation management even in the face of some short-term uncertainty as to owl impacts also must be viewed in conjunction of the very real short-term risk occasioned by habitat loss due to wildfire. According to the 2004 Framework, an annual average of 2.5 PACs a year have been lost or severely modified by wildfire since 1998. SNFPA 3336. Over the last four years, however, the annual loss has increased to 4.5 PACS, and according to the FSEIS, mechanical thinning planned under the 2004 Framework is expected to

---

fire risk reduction and faster development of high quality habitat, we find that 2001 Framework does not constitute a significant threat to CASPO at this time. SNFPA 3258 Based on both the 2004 SEIS and its accompanying

BE the Forest Service concluded that while the 2004 Framework decision "may affect individuals, but [is] not likely to trend toward Federal listing." SNFPA at 3946.

reduce rate at which habitat within PACs and SOHAs is lost to wildfire. *Id.*

The FSEIS also addresses specific areas of concern identified by owl scientists as representing potential areas where future problems would be greatest if owl's status in Sierra Nevada were to deteriorate. SNFPA 3341. Despite the cumulative benefits of reducing devastating wildfire as discussed above, the FSEIS nonetheless recognizes that the management prescriptions adopted by the 2004 Framework do risk the reduction of owls and owl habitat in some areas of concern. SNFPA 3342. This also constitutes a recognition of short-term impacts.

Significantly, too, in terms of short-term impact, the record also contains Lee and Irwin's article on assessing risks to spotted owls from forest thinning, which recognizes that "modest fuels treatments are compatible with territory-level canopy cover needs for spotted owl reproduction in the Sierra Nevada." *See* SNFPA 2654.

Additionally, in terms of acreage, over the last 30 years wildfire in the Sierra Nevada has burned an average of about 43,000 acres per year, whereas in the last ten years, that average has risen to about 63,000 acres per year. SNFPA 3083. Projections comparing the anticipated effects of the 2001 Framework versus its 2004 successor show a decrease from 63,-000 acres to 60,000 during the first decade. That figure decreases to 49,000 acres in the fifth decade, with implementation of the 2004 Framework estimated as accounting for a 22 percent decrease in the acreage lost due to wildfire as opposed to only 2 percent with the 2001 version. *Id.* To the extent that the hypothesized trend of increasingly large, high severity wildfires is correct, the rate of loss of PACs would be expected to mirror this increase. That suggests a severe short-term risk.

According to the FSEIS, any short-term decreases in certain owl habitat are coun-terbalanced by longer term cumulative increases in all suitable habitat types. SNFPA 3336. Moreover, because of the risk of negatively affected CASPOs in the short term by mechanical treatments, the FSEIS directs line officers to proceed with extreme caution when proposing and vegetation management within PACs and to attempt to avoid such treatment wherever possible. SNFPA 3350.

The fisher's habitat needs are similar to that preferred by owls. SNFPA 3314. Although the 2004 Framework predicts that fisher habitat attributes will also trend upwards over time (SNFPA 3320), Plaintiffs nonetheless claim that the extent of short term habitat degradation not properly analyzed. Plaintiffs further contend that the short-term impact of forest management over the next 10–20 years is also of primary concern for the fisher, because "[g]iven the current low density of fishers in the Sierra Nevada.... the loss of even a small number of fishers could significantly impact the population." FEIS Vol. 3. Ch. 3, pt. 4.4 at 9.

The FSEIS for the 2004 Framework does analyze short-term impacts to the fisher as summarized in the section entitled "Habitat Conditions in the Short–Term and Long–Term." SNFPA 3314. The Forest Service determined that short-term impacts on snag levels, down wood debris, and fisher prey would not be significantly different between the treatment alternative chosen under the 2004 Framework and its 2001 predecessor. SNFPA 3318–19. In analyzing the short-term effects from reduced canopy closure, the Forest Service found that the proposed thinning of the canopy "should not limit connectivity between stands of higher canopy cover, denning-quality habitat, because proposed treatment would only affect ap-

proximately 25–30 percent of the forested area." SNFPA 3317.[18]

As to marten, the Forest Service analyzed short-term impacts in finding that the short-term impacts on large live trees, snags, downed woody debris and meadow and riparian habitats would not be significantly different under the 2004 Framework as compared to the 2001 Framework. SNFPA 3323–3330. Although canopy cover will be impacted under both frameworks, the Forest Service found that adequate levels of ground cover and downed logs would remain to provide suitable marten habitat. SNFPA 3325. Because suitable habitats for the marten are currently either broadly distributed or highly abundant because of the relatively minimal impact either Framework will have on the marten, both the 2001 and 2004 Frameworks are expected to result in a broad distribution of marten. SNFPA 3330. At any rate, the effect of fuels treatment proposed by the 2004 Framework upon marten habitats is expected to be minimal in any event because marten typically occupy habitats at higher elevations than most of the proposed treatment areas. SNFPA 3325.

Additionally, examination of the Framework shows that more emphasis of short-term effects was added to the FEIS in response to public comments. As the Forest Service stated, "the FEIS discusses short-term impacts of the Alternatives on

CASPOs and considered the tradeoffs of treatments to protect and enhance long-term sustainability of resources, species viability, and impacts on multiple resources. It is the responsibility of the Responsible Official to weigh this information and select the alternative that best balances risk, uncertainty, effects to resources, and public welfare and safety." SNFPA 3517. The SEIS recognizes that there is continuing scientific uncertainty regarding habitat relationships and population trends of the California spotted owls. The SEIS also recognizes that there is "considerable concern for the long-term habitat loss and fragmentation caused by large high severity wildfires." SNFPA 3606.

In sum, Plaintiffs' arguments that the SEIS does not adequately consider short-term effects upon old forest species reflect a desire to see a level of detail that is not expected for a programmatic EIS, and a level of certainty that is not required by NEPA. The Ninth Circuit's decision in *Ecology Center v. Austin*, 430 F.3d 1057 (9th Cir.2005), relied upon by Plaintiffs, involved a project decision, not a programmatic decision, which requires less detailed analysis.[19] *See Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1357–58 (9th Cir.1994). Defendants are entitled to judgment in their favor on Plaintiffs' Fifth Claim, to the extent it alleges that

**18.** While Plaintiffs cite an August 1, 2005 article by Truex and Zielinski as support for the proposition that logging practices like that proposed by the 2004 Framework do in fact have significant short-term impacts on fisher habitat quality (see Ex. B to the Loarie Decl. in Supp. of Summ. J.), that 2005 study was obviously not presented to the Forest Service prior to January of 2004, the time of the 2004 decision. With several limited exceptions not applicable here, such post-decisional information should not be considered in evaluating the pertinent inquiry under NEPA; namely, whether the agency acted arbitrarily on the

basis of information it had at the time its decision was rendered. Consequently the Court declines to consider the Truex and Zielinski article here. *See Southwest Center for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir.1996).

**19.** Additionally, to the extent that the *Ecology Center* case mandated the use of specific scientific tools (like actual on-the-ground analysis with demonstrated reliability), the Ninth Circuit has since overruled the case. *Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008).

the 2004 Framework failed to adequately consider its direct and indirect impacts to old-forest species.

### B. Failure to Adequately Consider Opposing Scientific Viewpoints and Acknowledge Scientific Uncertainty

In alleging that the Forest Service did not adequately consider the effects of the 2004 Framework on old-forest species like the owl, fisher, and marten, Plaintiffs also contend that the Forest Service failed to take the requisite "hard look" at opposing scientific viewpoints to species impacts, and consequently violated NEPA on that ground as well. Plaintiffs further allege that the Forest Service did not properly consider scientific uncertainty in formulating the 2004 Framework, and identify that alleged shortcoming as yet another violation of NEPA.

■ We turn first to scientific uncertainty. With respect to the owl, Plaintiff allege that the 2004 Framework does not acknowledge what it describes as the "overwhelming scientific opposition" of owl biologists to the Framework. *See* Pls.' Mem. In Support of Summ. J., 36:4–6. To support that contention, Plaintiffs point to statements made by owl biologists Monica Bond and Dr. Jared Verner. According to Dr. Verner, "the FSEIS fails to adequately address many of the concerns we expressed [by letter] … [and] in meetings … regarding the [DSEIS]." BASIN 687; see also BASIN 895 (noting "little evidence that the various concerns and suggestions brought forth by the owl scientists are reflected" in the DSEIS). Monica Bond similarly claims that the FSEIS failed to respond to her detailed critique of owl proposals made in the DSEIS. BASIN 722.

The record shows, however, that Regional Forester Jack Blackwell conducted extensive meetings with the owl scientists relied upon by Plaintiffs in order to listen to their concerns. SNFPA 2432. Blackwell was informed at those meetings that owl distribution and density in the Sierra Nevada had been stable for the last ten years with no decline (SNFPA 2433) and that owl population "will never exhibit large increases because it is already at carrying capacity." SNFPA 2439. Nonetheless, in response to concerns voiced concerning the FSEIS, Blackwell wanted to ensure that the Framework was scientifically credible and accordingly asked that a Scientific Consistency Review ("SCR") be undertaken by an independent team of scientists to ensure the scientific credibility of the Framework. The results of the SCR were used by the interdisciplinary team preparing the FSEIS in order to improve its environmental analysis and acknowledge scientific uncertainty and differing points of view. SNFPA 2578–89; 2590–2601; 3002. Blackwell adopted the SCR's recommendation that adaptive management be employed and noted that the Forest Service has a long history of investing in monitoring data and research activities, like the California spotted owl demographic studies conducted for the past 15–20 years. SNFPA 3002. While Plaintiffs object to the scientific utility of adaptive management under the circumstances of this case, the Ninth Circuit's recent *McNair* decision makes it clear that choosing between and validating scientific methodologies is "not a proper role" for a federal court. *Lands Council v. McNair*, 537 F.3d at 987–88.

In addition to engaging in the SCR process and conducting agency meetings with scientists as discussed above, examination of the 2004 Framework also shows that it looked at the demographic data on the owl collected and described in the 2003 Meta-Analysis (SNFPA 2086, 2089) and that published research was divulged and assessed (SNFPA 2638–57). The SEIS spe-

cifically recognized scientific controversy regarding the owl[20], but at the same time acknowledged concern for long-term habitat loss and fragmentation caused by large high severity wildfires. 3606. All this points to a conclusion that the Forest Service took a hard look at impacts to the California spotted owl as required by NEPA.

Contrary to Plaintiffs' contention, contrary scientific opinion was disclosed. The FSEIS specifically recognizes owl biologist Jared Verner's 1992 conclusion that given spotted owl preferences for old growth features like significant canopy cover, large trees and snags, any activities that would degrade or remove any of these habitat attributes are believed to pose some level of risk to owl occupancy and production. SNFPA 3335. The FSEIS goes on to acknowledge uncertainty as to whether benefits of treating PACs to reduce their susceptibility to wildfire will outweigh the potential negative effects of the treatments on owl occupancy and habitat quality. *Id.*[21] In addition, it explicitly recognizes conflicting science about the effects on the spotted owl of canopy cover reduction caused by fuel treatments, like Hunsaker's 2002 study showing that owl productivity negatively correlated with a canopy cover less than 50 percent. SNFPA 3337. The FSEIS goes on to compare this analysis with a contrasting 2003 Lee and Irwin article which found that concerns about proposed fuel treatments having a negative effect on owls were not supported by either their analysis or other published information. SNFPA 3340.

While the Forest Service recognizes Lee and Irwin's research finding that lethal

fire simulations produced a pronounced and lasting negative effect on the owl (SNFPA 2639), as indicated above it also concludes that the pace and intensity of mechanical thinning planned under the alternative chosen by the 2004 Framework is expected to reduce the rate at which habitat within PACs and SOHAs is lost to wildfire. SNFPA 3336.

In addition to disclosing the existence of opposing science in citations contained within the SEIS, the Forest Service also addressed scientific controversy in its responses to numerous public comments engendered by the draft SEIS. *See, e.g.,* SNFPA 3600–3616(owl).

Because the fisher's habitat needs are similar to that preferred by owls as discussed above (SNFPA 3314), and because there is virtually no evidence that the fisher has populated the Northern Sierra Nevada area where most of the fuel treatments proposed by the 2004 Framework in any event, no further discussion of scientific controversy concerning the effects of the proposed forest management measures is necessary at this time.

As indicated above, the effects of the 2004 Framework on marten habitat would also appear to be minimal given evidence that the species occupies habitats at higher elevations than most of the proposed treatment areas. SNFPA 3325. Nonetheless, the FSEIS recognizes competing science with respect to marten preferences for percentage of canopy cover. It cites Bull and Heater's research, which concluded that radio-collared martens in their study area avoided all harvested and unharvested forest stands with less than 50 percent canopy closure. *Id.* At the same time,

---

**20.** *See* SNFPA 3340 ("There is conflicting science about the effects of canopy cover reductions from fuels treatments on the California spotted owl."); *see also* SNFPA 3144.

**21.** *See also* SNFPA 3342 (citing Blakesley & Noon's 1999 study for the notion that certain activities "would increase uncertainties associated with successful dispersal and mate finding").

however, three other previous studies were disclosed which reached conclusions suggesting that 30 percent was a more appropriate guideline. (SNFPA 3325, citing Koehler et al. 1975, Steventon et al. 1982, Spencer 1981). The FSEIS goes on to recognize that yet another study, by Kucera in 2000, indicates that marten home ranges have an average of only 20 percent canopy cover. *Id.*

Having determined that scientific controversy is adequately disclosed in the 2004 Framework, we next turn to the question of whether the extent of scientific uncertainty associated with the species in question is properly addressed. Despite Plaintiff's contention to the contrary, scientific uncertainty about the effect of proposed fuel treatments on the species in question is disclosed throughout the SEIS with specific literature references. *See, e.g.,* SNFPA 3313, 3314, 3315 (including literature citations for research on fisher); SNFPA 3337 (citing Self and Kerns, 2001 Kucera, 2000, Spencer, 1981, SNFPA 3325) (for the marten); SNFPA 3337, 3340, 3342 (citations for the owl).

The 2004 Framework recognizes that there is continuing scientific uncertainty regarding habitat relationships and population trends of the California spotted owls. Scientific uncertainty regarding the owl, fisher and marten are discussed throughout the SEIS. *See, e.g.,* SNFPA 3143–48, 3212 (uncertainty regarding marten distribution); see also SNFPA 3145 (acknowledging the "relatively little information" about key habitat elements for fisher).

In addition to disclosing scientific uncertainty and opposing viewpoints through the SEIS, its response to public comments, and the SCR, the Forest Service also acknowledged scientific uncertainty in its ROD for the 2004 Framework. SNFPA 3002 (explaining that the SCR was used to improve the SEIS and to "acknowledge

scientific uncertainty and differing points of view").

Scientific uncertainty is also addressed at some length in the Scientific Consistency Review requested by the Forest Service, which included analysis of 1) whether applicable and available scientific information had been considered; 2) whether scientific information had been interpreted reasonably and accurately; 3) whether uncertainties associated with the scientific information had been acknowledged; and 4) whether risks and uncertainties had been identified and documented. SNFPA 3504, 3526; see also SNFPA 2356, 3503–24 (explaining how SEIS was improved based on SCR).

The Forest Service refined its analysis and discussion of the spotted owl based on the SRC team's commentary. See SNFPA 2578–2589; 2590–2601. The Forest Service stated that "[m]ore emphases and discussion on short-term effects and associated risk [to the California spotted owl] was added to the SEIS and is considered in the Adaptive Management Process." SNFPA 2601.

In sum, after carefully examining the record, the Court determines that the 2004 Framework was adequately considered contradictory opinions through its acknowledgment of scientific controversy and uncertainty concerning potential impacts of the treatment proposals on the owl, fisher and marten. That consideration including references to applicable literature in the SEIS, the SCR, and the ROD all prepared in conjunction with the Framework. The requirements of NEPA are consequently satisfied. *See Seattle Audubon Soc'y v. Lyons,* 871 F.Supp. 1291, 1321 (W.D.Wash.1994) (The agency having engaged in numerous studies and analyses on the owl satisfied NEPA's requirement to take a "hard look" at available data).

The fact that an agency's approach has been critiqued, or that alternative methodologies have been disclosed, does not render an EIS arbitrary. *See Edwardsen v. U.S. Dept. Of Interior,* 268 F.3d 781, 786 (9th Cir.2001). It is well recognized that "disagreement among the experts is inevitable when the issues are at the 'very frontiers of scientific knowledge,' and such disagreement does not preclude [courts] from finding that the [agency's] decisions are adequately supported by evidence in the record." *Lead Indus. Ass'n, Inc. v. EPA,* 647 F.2d 1130, 1160 (D.C.Cir. 1980). So long as contrary opinion is adequately disclosed, an agency "is under no obligation to conduct new studies in response to issues raised in the comments, nor is it duty-bound to resolve conflicts raised by opposing viewpoints." *See California v. Block,* 690 F.2d 753, 773 (9th Cir.1982).

Additionally, the existence of uncertainty does not preclude the agency from taking action, so long as that uncertainty has been identified. *See Village of False Pass v. Clark,* 733 F.2d 605, 614 (9th Cir.1984), citing *Sierra Club v. Sigler,* 695 F.2d 957, 970 (5th Cir.1983) ("the unavailability of information, . . . . should not be permitted to halt all government action ... This is particularly true when information may become available at a later time and can still be used to influence the agency's decision."). The Ninth Circuit's recent *McNair* decision also makes it clear that judicial intervention to resolve every possible scientific uncertainty is not the court's proper role. *Lands Council v. McNair,* 537 F.3d at 987–88. Moreover, just because Plaintiffs may disagree with the Forest Service's impact assessment does not mean that the court can "substitute its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Instead, because its Framework adequate-ly disclosed and addressed competing scientific viewpoints, the Forest Service's decision merits deference, and Plaintiffs' NEPA challenge must accordingly be rejected. *See Earth Island Inst. v. U.S. Forest Serv.,* 351 F.3d 1291, 1301 (9th Cir. 2003) ("[An] agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints."). Based on the foregoing, the Court concludes that the 2004 Framework satisfactorily addressed, for purposes of complying with NEPA, both scientific opposition and uncertainty with regard to its impacts on the owl, the fisher and the marten.

## C. Failure to Consider Cumulative Effects to Old Forest Species

Plaintiff's Sixth Claim also targets the owl, fisher and marten, contending that the 2004 Framework also runs afoul of NEPA by failing to analyze the cumulative impacts to those species occasioned by implementing both the Framework, the Basin Plan, and the Giant Sequoia National Monument Management Plan ("GSNM Plan"). Pls.' Am. Compl., ¶ 116–119. We first analyze Plaintiffs' NEPA challenge involving the 2004 Framework as a whole.

Plaintiffs concede that as much as the 2004 Framework establishes management direction for the rest of the Sierra Nevada, the GSNM Plan sets policy for managing the Giant Sequoia National Monument, an entity created by presidential proclamation in 2000 and covering some 327,769 acres in the southern Sierra Nevada. *See* Pls.' Mem. In Support of Mot. Summ. J., 39:15–18; *see also* GSNM ROD at 3 (Ex. C to Loarie Decl.). Consequently it appears that both the Framework and the GSNM Plan are broad programmatic documents rather than site-specific proposals for actual logging and fuels treatment.

Plaintiffs point out that the GSNM Plan, like the Framework, authorizes logging of trees up to 30 inches in diameter. Plaintiffs claim that the FSEIS for the Framework violates NEPA because it fails to adequately consider the cumulative impact of such logging under the 2004 Framework and the GSNM Plan upon old forest species, and particularly the fisher and, apparently to a lesser extent, the spotted owl. Pls.' Mem. in Support of Mot. Summ. J., 39:10–12, 39:23–40:2.

The Forest Service disagrees, first noting case law that grants considerable deference to an agency's determination of the proper scope of a NEPA analysis, including the scope of its cumulative effects review. *Kleppe*, 427 U.S. at 414, 96 S.Ct. 2718; *Native Ecosystems Council v. Dombeck*, 304 F.3d at 893–94; *Neighbors of Cuddy Mtn.*, 303 F.3d at 1071. The Forest Service goes on to argue that it reasonably tailored its cumulative effects analysis of the 2004 Framework vis-a-vis the GSNM Plan to issues relating to wildfires. The FSEIS states unequivocally that the "largest events affecting viability of the fisher population in the southern Sierra appear to be large stand replacing wildfires." SNFPA 3320. Given the primacy of that concern, the Forest Service points out that the 2004 SEIS does discuss the cumulative effects of treatment under the GSNM Plan to reduce the risk of stand replacing fires, and further projects the cumulative effects of other proposals, including the GSNM Plan, through modeling.

The 2004 Framework FSEIS contains an entire section addressing the Giant Sequoia National Monument. That section is contained within the FSEIS' discussion of the Framework's effects upon the fisher. The cumulative effects analysis concludes that protective treatments under the GSNM Plan are designed to reduce the risk of catastrophic fire and ultimately increase the amount of large trees and thereby improve the quantity and quality of old forest habitat. SNFPA 3322. The particular challenges of moving giant sequoia groves towards desired conditions, a task quite different from the remainder of the Sierra Nevada encompassed by the 2004 Framework, is also addressed. By reducing tree density, however, the analysis notes larger trees will be better able to escape severe damage or death from fire and grow more rapidly than under denser stand conditions. *Id.* Additionally, the amount and/or vigor of younger trees less than thirty years old is also projected to increase under the GSNM Plan, with thinning designed to protect such trees from excessive fire mortality. *Id.* Moreover, as indicated above, elsewhere in the FSEIS modeling projections are employed, which include the expected cumulative effects of green tree harvest volume not only by each National Forest in the Sierra Nevada region but also by the Giant Sequoia National Monument. SNFPA 3389, *see also* SNFPA 3472 (discussing the modeling assumptions for acres of treatment applicable to the GSNM).

Given the deference accorded an agency's assessment of the breadth of a cumulative effects analysis, and particularly in light of the fact that both the Framework and the GSNM Plan were formulated for management purposes, the Court cannot find fault with the Framework's discussion of the cumulative effects associated with the GSNM Plan for failing to provide the "quantified or detailed assessment" of impacts stemming from implementation of logging under the GSNM plan, as Plaintiffs advocate. Pls.' Mem. In Support of Summ. J., p. 40. Because the Framework's programmatic scope does not include site-specific project proposals, the Forest Service did not have to quantify or detail the environmental impacts of on-the-ground logging projects not yet proposed.

*Ohio Forestry*, 523 U.S. at 729–733, 118 S.Ct. 1665. The law is clear that NEPA does not require an agency to "quantify every risk." *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1359–60 (9th Cir.1994). The FEIS acknowledges the difficulty of estimating the number of fisher territories that might be affected at a programmatic level. See SNFPA 3318. Making those judgments must instead wait for the prescribed scope of an imminent on-the-ground plan limited to a particular area. Neither the 2004 Framework of the GSNM Plan by definition constitute such site-specific activity.

Given these factors, it was not arbitrary for purposes of NEPA for the Framework to concentrate on the cumulative effects of habitat reduction by stand-replacing fires, as well as the concomitant increase in old-forest conditions engendered by such reduction. As made clear above, such conditions are key in maintaining the viability not only of the fisher but also of the California spotted owl.

In sum, despite the fact that the GSNM Plan was not selected until December of 2003, after the 2004 Framework FSEIS was prepared,[22] because the GSNM proposal was nonetheless expected the Framework proceeded to consider what it reasonably could in terms of its cumulative effects. Under the circumstances, the Forest Service took the "hard look" at cumulative impacts occasioned by the GSNM Plan as required by NEPA.[23] Consequently, Defendants are entitled to judgment in their favor as to Plaintiff's Sixth Claim insofar as that claim targets the 2004 Framework for failing to adequately

consider its cumulative impact in conjunction with the GSNM Plan.

## D. Failure to Consider Reasonable Range of Alternatives

For a Seventh Claim, Plaintiffs contend that the 2004 Framework FSEIS failed to analyze a reasonable range of alternatives to the course of action ultimately adopted. Pls.' Am. Compl., ¶¶ 120–126. Plaintiffs assert that this failure violates NEPA.

 NEPA does require that federal agencies like the Forest Service herein "produce an EIS that rigorously explores and objectively evaluates all reasonable alternatives so that the agency can sharply define the issues and provide a clear basis for choice among options by the decision-maker and the public to consider alternatives to the proposed action." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1120 (9th Cir.2002) (citing 40 C.F.R. § 1502.14). As the Ninth Circuit explained, "NEPA regulations describe this alternatives requirement as the 'heart' of the EIS." *Id.* An EIS is inadequate for purposes of NEPA if it fails to address "[t]he existence of a viable but unexamined alternative." *Natural Res. Def. Council*, 421 F.3d at 813.

 According to Plaintiffs, because the 2004 Framework analyzed only two alternatives in any detail (the "no-action" alternative of retaining the existing 2001 Framework and the proposed modification constituting its 2004 successor), the Forest Service failed to consider a reasonable range of alternatives as required by NEPA. The Forest Service counters this

22. See SNFPA 3322 ("The final environmental impact statement will be available in late 2003").

23. While Plaintiffs cite *The Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir.2005) for the proposition that the Forest Service did

not provide enough detail concerning the cumulative effect that the 2004 Framework and the GSNM Plan will have on old forest species like the fisher and owl, that case deals with the requirements applicable to a site-specific project and is therefore distinguishable from this matter.

argument by asserting that because the 2004 Framework was by definition a "supplemental" environmental impact statement to the original 2001 version, the consideration of numerous alternatives considered in conjunction with the 2001 Framework must necessarily be incorporated by reference in the 2004 version presently under scrutiny. Plaintiffs respond by alleging that because the 2001 and 2004 Frameworks rely on different assumptions and models to gage the environmental consequences of the various alternatives, and because the alternatives developed in 2001 were designed to address a significantly different purpose and need than that identified in 2004, the 2004 Framework cannot fall back to the alternatives analyses contained within its predecessor.

This viability of these competing arguments has recently been squarely addressed by the Ninth Circuit within the context of a decision overruling this Court's denial of a preliminary injunction sought by Plaintiffs to permit logging within three site-specific proposals (Basin, Empire and Slapjack) approved by the Forest Service for logging. In *Sierra Forest Legacy v. Rey*, 526 F.3d 1228 (9th Cir.2008), the Ninth Circuit looked specifically at whether or not the 2004 Framework rigorously explored and objectively evaluated all reasonable alternatives in analyzing whether Plaintiffs had demonstrated a probability of success on the merits for purposes of their entitlement to preliminary injunctive relief. It unequivocally concluded that the Forest Service "cannot rely on its discussion of alternatives in the 2001 FEIS to satisfy its requirement [that

reasonable alternatives be evaluated] for the 2004 FEIS." *Id.* at 1231.

 In reaching this conclusion, the *Sierra Forest Legacy* court reasoned that because the Forest Service altered its modeling techniques between the issuance of the 2001 FEIS and the 2004 SEIS but failed to update its analysis of the 2001 FEIS alternatives to reflect these new techniques, changed circumstances were present that rendered improper any reliance by the 2004 Framework on its 2001 predecessor. *Id.* As the court stated, "where changed circumstances affect the factors relevant to the development and evaluation of alternatives," the Forest Service "must account for such change in the alternatives it considers." *Id.*, citing *Natural Res. Def. Council*, 421 F.3d at 813–14.

Given the Ninth Circuit's clear precedent on the very issue presently before this Court, summary adjudication in Plaintiffs' favor must be granted as to the Seventh Cause of Action.

### E. Adequacy of Public Participation in the Basin Project's Draft Environmental Assessment

Having addressed Plaintiffs' NEPA challenges to the 2004 Framework as a whole, we now turn to the site-specific challenges mounted by Plaintiffs to the Basin Project.[24] First, in their Twelfth Cause of Action, Plaintiffs assert that the Forest Service violated NEPA by not ensuring adequate public participation in the Basin Project's Draft Environmental Assessment ("EA").

 Plaintiffs claim that because the draft EA for the Basin Project was not

---

**24.** After briefing on the summary judgment motions presently before the Court was concluded, Plaintiffs obtained leave of court to file a Second Amended Complaint that added the so-called Empire and Slapjack Projects to

the Basin Project that previously had been the only site-specific project raised by Plaintiffs' pleadings. This Memorandum and Order addresses the Basin Project only.

specifically disseminated for public consideration and comment, the approval of the EA violates the public disclosure mandate of NEPA. Alternatively, Plaintiffs contend more generally that the Forest Service failed to involve the public to the extent practicable in its assessment of the Project's environmental impacts, as required by NEPA.

One of NEPA's key objectives is in ensuring active involvement and access to information with regard to proposed actions affecting the environment. *Price Rd. Neighborhood Ass'n v. U.S. Dept. Of Transp.,* 113 F.3d 1505, 1511 (9th Cir. 1997); *see also California v. Block,* 690 F.2d 753, 761 (9th Cir.1982) (stating that NEPA's purposes are to "foster both informed decision-making and informed public participation"). NEPA's implementing regulations flush out this fundamental objective by, requiring, *inter alia,* 1) that the public be involved, to the extent practicable, in the agency's preparation of an EA and its ultimate decision whether to prepare an EIS, 40 C.F.R. § 1501.4(b); 2) that agencies "encourage and facilitate" public involvement in decisions that affect the environment, 40 C.F.R. § 1500.2(d); and 3) that agencies make "diligent efforts" to involve the public in NEPA procedures, 40 C.F.R. § 1506.6. The regulations make it clear that the purpose of these and other provisions is to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken", with public scrutiny being "essential" in satisfying NEPA's objectives. 40 C.F.R. § 1500.1(b).

With respect to a full EIS, the NEPA rules make it clear that a draft EIS must be circulated for public comment before being prepared in final form. *See* 40 C.F.R. § 1502.19, 1503.1–1503.4. Plaintiffs, however, do not assert that the Forest Service should have employed the greater detail and analysis entailed by a full EIS (reserved for instances where the proposed action "significantly affects" environmental quality) as opposed to the EA ultimately chosen for the Basin Project. EAs are by definition simpler documents not subject to the same rigorous scrutiny as an EIS. *Indiana Forest Alliance v. U.S. Forest Serv.,* 325 F.3d 851, 856 (7th Cir. 2003). They are designed to reduce government costs, paperwork and delay through a "concise" public document. 40 C.F.R. § 1508.9. An "EA cannot be both concise and brief and provide detailed answers for every question." *Newton County Wildlife Ass'n v. Rogers,* 141 F.3d 803, 809 (8th Cir.1998).

Plaintiffs' primary argument that the Forest Service ran afoul of NEPA by not publicly circulating the Basin Project EA is based upon a statement contained within the Ninth Circuit's decision in *Citizens for Better Forestry v. U.S. Dept. of Agriculture,* 341 F.3d 961 (9th Cir.2003) ("CBF") to the effect that "the public must be given an opportunity to comment on draft EAs and EISs." *Id.* at 970, quoting *Anderson v. Evans,* 314 F.3d 1006, 1016 (9th Cir.2002).

The Ninth Circuit recently revisited this area in *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,* 511 F.3d 1011 (9th Cir.2008). Despite Plaintiffs' claim that *CBF* and *Anderson* established a requirement that a draft EA be circulated, the Ninth Circuit in *Bering Strait* found that "[o]ur law currently does not make that clear ..." *Id.* at 1024. The court rejected the notion that its previous holdings had decided the question, describing its previous statement in *Anderson,* about the circulation of a draft EA, to be simply dicta (*Id.* at 1025). That conclusion meshes with the Forest Service's analysis provided here concerning the state of Ninth Circuit law before *Bering Strait.*

The *Bering Strait* court held unequivocally that the circulation of a draft EA is not required in every case. *Id.* It stressed the fact that the regulations governing public involvement in the preparation of EAs, as discussed above, are general in approach, and consequently that "requiring the circulation of a draft EA in every case would apply a level of particularity to the EA process that is foreign to the regulations." *Id.* This disposes of Plaintiffs' first contention, that the Basin Project violated NEPA simply because a draft EA was not circulated.

In its decision, the *Bering Strait* court cited approvingly a decision from this District, *Sierra Nevada Forest Protection Campaign v. Weingardt*, 376 F.Supp.2d 984, 991 (E.D.Cal.2005) which also found that circulation of a draft EA is not invariably required.[25] The Ninth Circuit looked to *Weingardt's* reasoning in addressing the next issue raised by Plaintiffs in this case; namely, just "what level of public disclosure is required under NEPA before issuance of a final EA?" *Bering Strait*, 511 F.3d at 1025–26.

After citing language from *Weingardt* indicating that the public should simply be provided as much environmental information as is practicable prior to completion of the EA, and commending that analysis, the Ninth Circuit made the following pronouncement:

> "[W]e now adopt this rule: An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency-making process." *Id.* at 1026.

In *Bering Strait*, although a draft EA was not circulated, the court found that information about the project was nonetheless widely disseminated throughout the community. In that case, the Alaska Gold Company ("AGC") requested commentary from the public on its proposal for renewing the mining of gold ore in an area already mined during Alaska's early Gold Rush history. After receiving comments from both individuals, organizations, and federal and local agencies, AGC revised its scoping notice to consider the environmental consequences of the project, to evaluate alternative project designs, and to review commentary from the public already received. The Ninth Circuit deemed that process adequate for purposes of NEPA. *Id.*

Here, the Forest Service gave public notice of its Basin Project in December 2003 to 435 potentially interested and affected parties. BASIN 3044, 3651. It thereafter mailed a Proposed Action description with a solicitation for public comment in March of 2004. BASIN 3132–48. A Public Notice concerning the project was also published by newspaper at approximately the same time. BASIN 3155. The Proposed Action description described the proposed action, its purpose and design, as well as the design to be employed and mitigation measures to be undertaken. Maps of the project area were provided. BASIN at 3134–3148.

---

**25.** *Weingardt* considered a challenge to the process utilized by the Forest Service in approving several logging projects. Although the Forest Service issued a scoping notice for public comment, which included a description of the proposed action as well as its purpose and need and proposed mitigation measures, the notice contained no information or analysis concerning impacts to wildlife or other environmental resources and lacked any discussion of potential cumulative impacts. *Id.* at 986–987, 992. In addition, for three of the projects involved in *Weingardt*, the Agency actually withheld already-prepared analyses "even though the documents were completed before the end of the public comment period." *Id.* at 992–93.

Following its receipt of comments from the public to its description of the project, the Forest Service reviewed and responded to the comments received, including comments from representatives of the Plaintiffs submitted on several occasions. BASIN 3211, 3240–3258; see also 3180–3196, 3274–94. The Forest Service even accepted comments after the deadline. BASIN 3493–3519.

The Forest Service also provided two notices of public meetings to be held at the Feather River Ranger District's offices in Oroville concerning proposed projects within the District's territory, including the Basin Project. BASIN 3213, 3230. Pursuant to those notices, two public scoping/open house meetings were in fact held on June 15, 2004 from 5:00 to 8:00 p.m. and on June 16, 2004 from 6:30 a.m. to 8:30 a.m. A map of the Basin Project was available to those in attendance. Forest Service employees were at the meeting to answer specific questions relating to the Basin Project. See Decl. of Cindy Roberts, ¶ 4, attached as Ex. "C" to Fed Defs.' Opp'n to Mot. for Summ. J. Additionally, at the request of Craig Thomas, a representative of Plaintiff Sierra Nevada Forest Protection Campaign, an additional meeting was held between Mr. Thomas and a Forest Service employee in early June of 2004 regarding Thomas' concerns about the Basin Project. Id. at ¶ 3. Finally, the Forest Service responded to requests, including those submitted by Plaintiffs, by providing the final Biological Assessment/Biological Evaluation ("BA/BE"), the Decision Notice/FONSI and the EA itself in August 2004, following the close of public comments and before either the appeal time for the Basin Project had or any action on the project was attempted. BASIN 3521, 3656, 3757, 3764, 3763–3766.

As Weingardt recognized, public involvement and the distribution of information in a project affecting the environment can take many forms. Weingardt, 376 F.Supp.2d at 991 ("Depending on the circumstances, the agency could provide adequate information through public meetings or by a reasonably thorough scoping notice."). The Court concludes that even though a draft EA was not circulated, the Forest Service nonetheless took other steps sufficient to meet the public participation requirement of NEPA. Summary adjudication is accordingly granted in favor of Defendants as to Plaintiffs' Twelfth Claim.

## F. Failure of the Site–Specific Basin Project to Consider Cumulative Impacts

In their Ninth Claim, Plaintiffs allege that Forest Service also violated NEPA in approving the Basin Project by failing to take a "hard look" at the cumulative impacts of the Project together with past, present and reasonably foreseeable future actions. See Native Ecosystems Council v. Dombeck, 304 F.3d 886, 895 (9th Cir.2002). Plaintiffs point out that general statements about a "hard look" are not sufficient. Instead, they allege that the Forest Service had to identify or disclose the expected incremental impact from each timber sale, and explain how those impacts might interact in affecting the environment. Klamath–Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgt., 387 F.3d 989, 997 (9th Cir.2004).

The Basin Project is part of the QLG Pilot Project, which was addressed in both the HFQLG EIS and as part of the 2004 Framework. Consequently, the effects of other actions were properly analyzed as an aggregate at two larger scales—the HFQLG Pilot Project area (in the HFQLG EIS) and the entire Sierra (in the 2004 SEIS). See BASIN 1168–92, 1215–36, 1237–53 (incorporating HFQLG BA/BE); SNFPA 3256–63. Even Plaintiffs do not assert that Basin needs another EIS. Plaintiffs nonetheless argue that Klamath–

*Siskiyou* requires, even for EAs, a detailed, quantified assessment of the cumulative effects of a project on the habitat of sensitive species. *Klamath–Siskiyou Wildlands Ctr.*, 387 F.3d at 993–998.

The Court disagrees. After the impacts of the regional program have been addressed in a programmatic EIS, a project implementing that program consistently with that EIS "can be carried out without the agency's having to issue a new" EIS at every successive stage. *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 447 (7th Cir.1990); *see also Headwaters, Inc. v. BLM, Medford Dist.*, 914 F.2d 1174, 1178–79 (9th Cir.1990).

Plaintiffs' attempt to impose EIS-like duties on the Basin EA fails. An EA is by definition a "concise public document" which provides "brief discussions of . . . impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9.[26] Hence EAs are intended to be "rough-cut" and "low budget" and are not held to the level of detail required by a full EIS. *Indiana Forest Alliance v. U.S. Forest Serv.*, 325 F.3d 851, 856 (7th Cir.2003). Significantly, too, considerable deference is afforded to agencies like the Forest Service in determining the scope of review for cumulative impacts in any event. *Neighbors of Cuddy Mtn.*, 303 F.3d at 1071.

While Plaintiffs contend that the Basin Project's BA/BE simply concludes without any analysis that no significant cumulative impacts to the fisher, marten and owl are expected as a result of the project, the incremental effects of the Basin Project are in fact discussed for each species. *See* BASIN 3571, 3575–76. The BA/BE identifies numerous other projects within the analysis area, describes the silvicultural systems used (predominantly thinning or salvage prescriptions), the number of acres treated or otherwise affected, and likely effects. *See* BASIN 3563–3566. Cumulative impacts are also analyzed both for individual species and at the watershed level. *See* BASIN 3563–70; 3575–76; 3718, 3719, 3721.

For cumulative effects to old forest species like the owl, fisher and marten, the Basin EA could lawfully refer the reader to more detailed discussion of cumulative effects within the 2004 SEIS. *See Native Ecosystems*, 304 F.3d at 895–96 (for NEPA purposes, agency can either include a cumulative effects analysis or refer, or "tier" to an EIS that contains such analysis); 40 C.F.R. § 1502.20; *see also Portland Audubon Soc'y ("PAS") v. Lujan*, 884 F.2d 1233, 1239 (9th Cir.1989); *Headwaters*, 914 F.2d at 1178.

The Basin EA, for example, refers to projections contained within the 2004 SEIS for cumulative changes in habitat type that might impact the California spotted owl. BASIN 3720, citing to SNFPA 3330–3350. That analysis concludes that while suitable foraging habitat for the owl could diminish in early decades, any such reduction would later be offset. See BASIN 3720, 3339. Additionally, as indicated above, since the owl has been determined to be within the 95 percent confidence limits of a stable population (SNFPA 3340), the 2004 Framework reasonably concluded that cumulative habitat changes would not result in a loss of viability for the California spotted owl. *See* BASIN 3720.

It must also be noted that impacts to suitable habitat for the owl, fisher and marten within the Basin Project are expected to be relatively small (3.6 percent of the project area). Therefore, it was rea-

---

**26.** While Plaintiffs rely on the Ninth Circuit's decision in The *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir.2005), that case is distinguishable. *Lands Council* premised on greater information needed in an EIS, as opposed to an EA for an action significantly effecting environmental quality. *Id.* at 1027–28.

sonable for the Basin EA to conclude that cumulative impacts would be low. BASIN 3698, 3699. Timber harvesting and new roads construction in accordance with the Basin Project is not scheduled to occur in either goshawk or California spotted owl PACs which together comprise most of the habitat utilized by the fisher and marten. BASIN 3698, 3699. Additionally, with respect to the two forest carnivores, the Basin Project concluded that there have been no known den sites or a confirmed sighting of forest carnivores in the Basin analysis area in any event. BASIN 3575. Because direct effects are therefore not expected and indirect effects are also anticipated to be low, the Basin BA/BE reasonably predicted little cumulative impact occasioned by the Project. BASIN 3576, *see also* BASIN 3720, 3721 (Basin EA).

In assessing the Basin Project, the Forest Service was only required to analyze the incremental effect of a proposed action when added to effects of other actions in any event. 40 C.F.R. § 1508.7; *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 769–70, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (incremental effects of proposed action need only be analyzed "in the context" of other actions). Because the Supreme Court in *Public Citizen* carefully limited the consideration of incremental impacts to the concerned projects themselves, the cumulative impact rule does not require detailed consideration of the incremental impacts of prior actions. *Id.* It was therefore reasonable for the Basin EA to have focused only upon cumulative effects pertaining particularly to the Basin Project.

In sum, the cumulative effects analysis in Basin satisfied NEPA because it tiered to extensive analyses in two prior programmatic EISs (for the 2004 Framework as well as the HFQLG Act EIS), and because the Basin Project EA contains an adequate analysis of other factors actually specific to Basin. Defendants are accordingly entitled to summary adjudication in their favor on Plaintiffs' Ninth Claim.

### CONCLUSION

Based on the foregoing, following careful review and consideration of the parties' Cross–Motions for Summary Judgment in this matter, the Court finds in Plaintiffs' favor as to their Seventh Claim, for failure to consider reasonable alternatives to the 2004 Framework as required by NEPA. The Court otherwise grants Defendants' request for summary adjudication as to the remainder of the NEPA claims levied against the Framework in Plaintiffs' Fifth and Sixth Claims. In addition, with regard to Plaintiffs' claims under NFMA against the Framework, the Court finds in favor of Defendants as to those claims in their entirety, as set forth in the First, Second and Fourth Claims. That ruling is necessarily limited, however, to NFMA claims implicated by the Basin Project and does not extend to the so-called Empire and Slapjack Projects which were not the subject of the motions now being adjudicated by the Court. Finally, with regard to Plaintiffs' allegations related specifically to the Basin Project under both NEPA and the NFMA, the Court finds in favor of Defendants as to those allegations, as set forth in the Second, Ninth and Twelfth Claims. As requested by the parties, remedies issues with regard to the Seventh Claim shall be adjudicated following further briefing. The parties are directed to propose a briefing schedule to the Court for its consideration not later than ten (10) days following the date of this Memorandum and Order.[27]

IT IS SO ORDERED.

---

**27.** At the time of oral argument in this matter, counsel for Plaintiffs represented to the Court

that Plaintiffs were not pursuing their Third, Eighth, Tenth and Eleventh Claims. Those claims are accordingly moot at this time and will not be considered herein.